IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| HARVEY LEE CLEMMONS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:13CV777 |
| | ) | |
| NVT TECHNOLOGIES, INC., and | ) | |
| NATIONAL INSTITUTE OF | ) | |
| ENVIRONMENTAL HEALTH | ) | |
| SCIENCES, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on Defendant NVT Technologies' ("NVT's") Motion to Dismiss [Doc. #7]. In this action, Plaintiff Harvey Lee Clemmons ("Plaintiff") brings three claims for relief arising out of his prior employment with Defendant NVT: (1) a claim against Defendants for violation of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241, based on alleged retaliation for filing a Workers' Compensation claim, (2) a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") based on alleged racial discrimination and retaliation, and (3) a claim under North Carolina common law for wrongful termination. For the reasons that follow, the Court recommends that NVT's Motion to Dismiss be granted to the extent Plaintiff alleges a Title VII harassment/hostile work environment claim, but otherwise denied.

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

NVT hired Plaintiff, an African-American male, as a Stationary Engineer in August 2008. (Compl. [Doc. #3] ¶¶ 1, 10-11.) According to the Complaint, Plaintiff was injured at work in July 2010 when water infused with chemicals allegedly made contact with Plaintiff's skin. (Id. ¶ 21.) Plaintiff alleges that he reported the incident to upper management but was not informed of his potential Workers' Compensation rights. (Id. ¶ 24.) Despite ongoing treatment, Plaintiff allegedly continues to suffer from skin irritations and rashes as a result of this incident. (Id. ¶ 23.) According to the Complaint, in September 2012, Plaintiff suffered a reoccurrence of skin irritations and rashes resulting from the July 12, 2010 chemical exposure. (Id. ¶ 30.) Mr. Jim Burnette, Plaintiff's supervisor, allegedly informed Plaintiff at that time that Plaintiff might not be able to work with chemicals anymore and thus "probably could not work at [NVT] any longer." (Id. ¶ 31.) However, Plaintiff alleges that white employees holding the same position as Plaintiff were not required to work with chemicals. (Id. ¶ 32.) As a result of the skin rash reoccurrence, Plaintiff decided to file a Workers' Compensation claim sometime in September 2012 and, in order to do so, was instructed by his project manager, Mr. Keeler, to request an accident report from Supervisor Burnette. (Id. ¶¶ 33-35.) At the time of the filing of the Complaint, Plaintiff's Workers' Compensation claim remained open and he had not received any compensation. (Id. ¶ 36.)

Plaintiff further alleges that Supervisor Burnette often spoke to Plaintiff "in a harsh tone and used profanity and abusive language" and assigned Plaintiff undesirable and unsafe tasks. (Id. ¶ 27.) The Complaint further alleges that Supervisor Burnette did not treat similarly-situated white employees in this manner, nor did he assign them the similar undesirable and unsafe tasks that he

2

assigned to Plaintiff. (Id.) Moreover, Supervisor Burnette allegedly placed a dead snake on Plaintiff's truck, in order to, according to Plaintiff, "intimidate and frighten" Plaintiff. (Id. ¶ 28.)

According to the Complaint, on November 7, 2012, Supervisor Burnette confronted Plaintiff regarding Plaintiff's request for a respirator. Plaintiff alleges that Supervisor Burnette became abusive and profane toward Plaintiff. (Id. ¶ 38.) Later that same day, according to the Complaint, Plaintiff was meeting with a secretary regarding a claim reference number, and Supervisor Burnette came to the office and "began screaming and banging on the door." (Id. ¶ 40.) Plaintiff alleges that he was afraid of Supervisor Burnette and refused to open the door, and that the secretary let Supervisor Burnette into the room although Plaintiff believed that she was fearful as well. (Id. ¶ 41.) The Complaint alleges that the next day, Supervisor Burnette requested that Plaintiff stay after his shift to meet with Project Manager Keeler. (Id. ¶ 45.) Supervisor Burnette again allegedly became belligerent and profane, and Plaintiff did not feel comfortable waiting alone with Supervisor Burnette for Mr. Keeler, so Plaintiff left the facility. (Id. ¶¶ 46-48.) Upon leaving, Plaintiff allegedly encountered Mr. Keeler and told him about what had taken place with Supervisor Burnette, and Mr. Keeler promised to speak with Supervisor Burnette and told Plaintiff "not to worry about it." (Id. ¶ 50.)

Prior to returning for his next scheduled shift on November 13, Plaintiff was informed that he was going to be placed on paid leave pending an investigation. (Id. ¶ 51.) On the same day that Plaintiff was informed that he was being placed on leave, he filed a charge of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant National Institute of Environmental Health Sciences ("NIEHS"). NIEHS, a government entity, owns the plant where plaintiff worked, and NIEHS contracted with NVT to operate and manage that facility.

3

(Id. ¶¶ 6, 52.)  On November 20, 2012, Plaintiff amended his charge with the EEOC to change the employer to NVT.  On November 26, 2012, NVT terminated Plaintiff for cause, citing the following reasons: not following orders on work performance; not attending meetings when requested; and disregarding and ignoring supervisors' instructions.  (Id. ¶ 53.)  Plaintiff denies the validity and sufficiency of each alleged reason for his termination.  (Id. ¶¶ 54-58.)  Plaintiff contends that Supervisor Burnette was motivated to find cause to terminate Plaintiff in order to preserve a white employee's job that was threatened by a funding cut.  (Id. ¶ 59-60.)

On December 3, 2012, Plaintiff filed a second charge against NVT with the EEOC, alleging racial discrimination and retaliation.  (Id. ¶ 62.)  On January 15, 2013, Plaintiff filed a charge with the North Carolina Department of Labor ("NCDOL") alleging retaliation by NVT for Plaintiff's filing of his Worker's Compensation claim.  (Id. ¶ 63.)  Both the EEOC and NCDOL have issued Plaintiff Right-to-Sue Letters for his three separate charges.  (Id. ¶¶ 64-66.)

Plaintiff filed this action in state court alleging claims against Defendants for: (1) a violation of the Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241; (2) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, based on racial discrimination and retaliation; and (3) common law wrongful termination.  NVT removed the case to federal court [Doc. #1] and filed a Motion to Dismiss [Doc. #7].

II.  DISCUSSION

1.  Standard for Motion to Dismiss

"To survive a motion to dismiss pursuant to Rule 12(b)(6), plaintiffs' '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] their claims across the line from conceivable to plausible.'"  Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir.

4

2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). "[A] court must accept the material facts alleged in the complaint as true." Id. (citing Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)). However, "statements of bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

A Title VII plaintiff is not required to plead a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), because "[t]he prima facie case under McDonnell Douglas . . . is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002). Instead, the Court must consider, under the "ordinary rules for assessing the sufficiency of a complaint," Swierkiewicz, 534 U.S. at 511, whether the Complaint fails to state a plausible claim for relief under Title VII. See also McCleary-Evans v. Maryland Dep't of Transp., 780 F.3d 582 (4th Cir. 2015).

2. Retaliatory Employment Discrimination Act ("REDA")

Plaintiff first alleges that Defendant violated REDA by suspending and terminating him in retaliation for his filing of a Workers' Compensation claim. North Carolina law prohibits employers from taking retaliatory action against employees for, among other things, filing a claim under the state Workers' Compensation Act. See N.C. Gen. Stat. § 95-241(a)(1). A "retaliatory action" can include both the discharge and suspension of an employee. N.C. Gen. Stat. § 95-240(2). North Carolina courts have articulated three elements that a plaintiff must show to proceed on a REDA claim: (1) the plaintiff exercised a right protected by the statute; (2) the plaintiff suffered an adverse employment action; and (3) the adverse employment action occurred because the plaintiff exercised a protected right. Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186, 594 S.E.2d 809, 811

5

(2004). NVT in this case seems to challenge the Complaint only with respect to the causality element – i.e., that Plaintiff was fired *because* he filed a Workers' Compensation claim. (See Def.'s Br. [Doc. #8] at 4.) However, most of NVT's contentions are directed toward the ultimate evidentiary showing that Plaintiff must make, rather than the sufficiency of the pleadings. In the Complaint Plaintiff alleges that within a few weeks after he made a Workers' Compensation claim, he was suspended, and that the suspension and later termination were in retaliation for filing the Workers' Compensation claim.[1] See also Smith v. Computer Task Grp., Inc., 568 F. Supp. 2d 603, 614 (M.D.N.C. 2008) (noting that to establish a REDA claim, "a plaintiff may present evidence of close temporal proximity between the protected activity and the adverse employment action, or pattern of conduct"). In addition, in his Response Brief, Plaintiff also notes other allegations in the Complaint that would indicate NVT's unfavorable view and "disdain" toward his workplace injury, including failing to assist him in filing a Workers' Compensation claim, Supervisor Burnette's negative reaction toward his request for a respirator and toward the reoccurrence of his condition, and Supervisor Burnette's abusive conduct shortly after he requested an accident report. Having considered the parties' contentions, and based on the allegations in the Complaint, including the alleged temporal proximity between the filing of the Workers' Compensation claim and the suspension and termination, Plaintiff has stated a plausible claim at this stage in the case, and Plaintiff's REDA claim should survive Defendant's Motion to Dismiss.

The Court notes that in support of a contrary conclusion, NVT submitted with its Reply Brief certain personnel records of Plaintiff reflecting alleged performance issues pre-dating Plaintiff's

---

[1] Plaintiff in his Complaint does not specify the exact date on which he filed his Workers' Compensation claim, other than to provide it was sometime in September 2012 when he suffered a reoccurrence of rashes and skin irritation. Plaintiff's suspension came between 2 to 6 weeks later, on November 13, 2012.

6

Workers' Compensation filing. In connection with these records, Defendant's Reply cites Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006), for the proposition that, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." However, those personnel documents were not attached to or referenced explicitly in the Complaint. NVT nevertheless argues that the Court may consider them on the Rule 12(b)(6) motion because "Plaintiff referenced the non-existence of the attached statements." (Def.'s Reply [Doc. #11] at 4 n.2.) Specifically, NVT cites the following portion of the Complaint: "Upon information and belief, Plaintiff [] has never failed to follow an order on work performance. In fact, upon information and belief, there are no measures or evaluations of work performance conducted by Defendant NVT Tech at the Plant." (Compl. [Doc. #3] ¶ 54.)

It is well established that "as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage" and "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (quoting Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)). In this case, it cannot be fairly said that the documents NVT now seeks to rely on are in any way "integral to and explicitly relied on in the complaint." Moreover, "[t]hat the Complaint raises this general issue does not . . . permit the Defendant to selectively attach one of what may be many documents relevant to the issue, while avoiding the fuller picture provided by the discovery process." Robinson v. Quicken Loans, Inc., No. 3:12-0981, 2012 WL 3670391, at *4 (S.D.W. Va. Aug. 24, 2012) (unpublished). Indeed, at this stage, there is at least some question

7

regarding the authenticity of these documents. Although each document has spaces designated for the employee and a witness to sign, those fields remain blank, and Plaintiff claims that he had "no such notice of their existence, much less their contents." (Pl.'s Br. Mot. Strike [Doc. #17] at 4.) Accordingly, NVT's effort to introduce these documents at this time is improper on a Motion under Rule 12(b)(6), and the Court will decline to consider them in considering the sufficiency of the Complaint.[2]

    3.    Title VII Disparate Treatment Claim

Plaintiff next alleges a claim under Title VII for racial discrimination and retaliation. "Title VII prohibits an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e–2(a). Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

In its Motion to Dismiss, Defendant contends that the Complaint's failure to identify a

---

[2] Plaintiff, citing Rule 12(f) of the Federal Rules of Civil Procedure, filed a Motion to Strike the material in question. In a Text Order, the Court denied the Motion to Strike pursuant to Local Rule 7.6, which provides that "[r]ather than filing a motion to strike, a party may assert evidentiary objections in its response or reply memorandum to factual allegations contained in memoranda or replies supporting or opposing motions to dismiss, motions for summary judgment, and other motions" and "[i]f a separate motion to strike is filed asserting evidentiary objections, the motion to strike may be summarily denied by the Court, and any issues instead addressed in the ruling on the underlying motion." Cf. DiPaulo v. Potter, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010) ("Because Federal Rule of Civil Procedure Rule 12(f) applies to pleadings, however, the court will not strike the surreply but will simply not consider it and its attachments.") The Court has now considered the objections raised in the Motion to Strike and will decline to consider the information in question for the reasons set out above.

8

similarly-situated employee treated more favorably than Plaintiff is fatal to his claims. (Def.'s Br. [Doc. #8] at 6.)[3] However, the Complaint alleges that Plaintiff was treated differently than the other individuals in his job position who were white, based on Supervisor Burnette's alleged use of abusive language toward Plaintiff but not toward the white employees in his position, and based on Supervisor Burnette's alleged assignment of the dangerous tasks to Plaintiff, while the white employees were given more favorable assignments. Moreover, the real substance of Plaintiff's Title VII claim is that he was discharged when white employees were not, and the Complaint specifically alleges that, because of a funding issue, Plaintiff's supervisor terminated Plaintiff in order to preserve the job of a specific white employee. (Compl. [Doc. #3] ¶¶ 59-60.) Plaintiff further alleges that the reasons given for his termination were untrue, and that to the extent the termination was based on alleged failure to follow orders to perform certain tasks, that the white employees in his job position failed to perform those tasks without consequence. These allegations are sufficient to put Defendant on notice of the claims alleged, and to survive Defendant's Motion to Dismiss. To the extent Defendant contends that Plaintiff will be unable to present any evidence to substantiate these claims or to proceed on the merits, those matters are more appropriately considered on motions for summary judgment. Consequently, the Court recommends that Defendant's Motion to Dismiss Plaintiff's Title VII disparate treatment claim be denied.

---

[3] In its Reply, Defendant also contends that Plaintiff cannot show "satisfactory job performance" in light of the "evidence of multiple verbal warnings issued to Plaintiff over the course of several years." (Def.'s Reply [Doc. 11] at 6.) Defendant again points to matters outside the pleadings to support this argument. For the reasons already stated, consideration of that material at this juncture would be inappropriate, and those matters may instead be raised after a period of discovery on motions for summary judgment.

4. Title VII Retaliation Claim

"Title VII also prohibits employers from 'discriminat[ing] against any of [their] employees ... because [the employees] ha[ve] opposed any practice made an unlawful employment practice by [Title VII], or because [the employees] ha[ve] ... participated in any manner in an investigation' under Title VII. 42 U.S.C.A. § 2000e–3(a). The elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman, 626 F.3d at 190. Plaintiff in this case engaged in a protected activity by filing charges with the EEOC against NIEHS and NVT on November 13 and 20, 2012, respectively, and Plaintiff suffered an adverse employment action when he was terminated on November 26, 2012. NVT claims that it had no knowledge of the EEOC charges until after Plaintiff was terminated and thus could not have been acting in retaliation. (See Def.'s Br. [Doc. #8] at 9.)

Close temporal proximity between a plaintiff's protected activity and the adverse employment action may be "strongly suggestive of retaliatory motive and thus indirect proof of causation." Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). In this case, Plaintiff was discharged less than two weeks after he filed his initial complaint with the EEOC and less than one week after he amended the name to reflect NVT. Despite NVT's claim that it had no knowledge of Plaintiff's EEOC charge (Def.'s Br. [Doc. #8] at 9), this alleged fact is not in the pleadings, is disputed by Plaintiff, and is not appropriately considered on this Motion to Dismiss. See also Miller v. Carolinas Healthcare Sys., 561 F. App'x 239, 241 (4th Cir. 2014). Accordingly, the Court recommends that the Motion to Dismiss be denied as it relates to Plaintiff's Title VII retaliation claim.

10

5.  Title VII Hostile Work Environment Claim

Defendant also seeks dismissal of any claim for "hostile work environment" under Title VII. To maintain a hostile work environment claim, "'a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex [or race], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer.'" Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011) (quoting Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008)) (alteration provided by Bonds).

In considering Defendant's contentions on this issue, the Court notes that it is not clear from the Complaint that Plaintiff intended to assert a hostile work environment claim separate from the discriminatory discharge and retaliation claims discussed above. That is, it appears that the Complaint sets out allegations regarding Supervisor Burnette in an effort to establish that Plaintiff's discharge was based on race, or to establish that Plaintiff was harassed in retaliation for the pursuit of his Workers' Compensation claim. However, although Plaintiff alleges generally that Supervisor Burnette was profane and belligerent, it does not appear that Plaintiff has attempted to allege harassment that was objectively severe or pervasive to support a separate racially hostile work environment claim. For harassing conduct to be actionable, it must create "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). Relevant to that determination are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. In the Fourth Circuit, a disparity in power between the alleged harasser and the plaintiff is probative. Ziskie, 547 F.3d at 227-28. However, "Title VII is

11

not 'a general civility code,'" and "[p]rofanity, while regrettable, is something of a fact of daily life." Id. at 228 (quoting Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).  In general, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test."  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).

In this case, the Complaint generally alleges that "Mr. Burnette often spoke to Plaintiff [] in a harsh tone and used profanity and abusive language when addressing him" and that "other employees with allegiances to Mr. Burnette" subjected him to "harassment and abusive behavior." (Compl. [Doc. #3] ¶¶ 26-27.)  Plaintiff also identifies a small handful of specific instances of alleged harassment.  For example, the Complaint alleges that, on an unknown date, Supervisor Burnette participated in placing a dead snake on Plaintiff's truck which Plaintiff believes was meant to intimidate and frighten him.  (Id. ¶ 28.)  The Complaint also alleges generally that "Mr. Burnette assigned Plaintiff Clemmons undesirable and unsafe tasks and responsibilities that, upon information and belief, he did not assign to similarly situated white employees."  (Id. ¶ 27.)  With respect to specifics, however, the Complaint only describes four distinct encounters between Plaintiff and Supervisor Burnette, all of which occurred on November 7 and 8, 2012 (id. ¶¶ 38-46), throughout all of which Supervisor Burnette was variously "profane," "belligerent," and "abusive."

Thus, it does not appear that the Complaint states, or has attempted to state, that the harassment was objectively severe or pervasive in order to establish a separate hostile work environment claim.  Most of the enumerated incidents for which the Complaint provides any detail occurred within a two-day period immediately prior to Plaintiff's suspension, and even those incidents are only vaguely described.[4]  Moreover, outside of that brief period, the Complaint

---

[4] "[A]n 'isolated incident[ ]' of harassment can 'amount to discriminatory changes in the terms and conditions

12

contains minimal factual allegations of circumstances that would render Plaintiff's workplace environment racially hostile. That is, the Complaint describes one specific, but undated, incident of Supervisor Burnette participating in placing a snake in Plaintiff's truck, and otherwise generally alleges that Supervisor Burnette, or others with allegiances to Supervisor Burnette, subjected Plaintiff to harassment and abusive behavior and assigned Plaintiff undesirable and unsafe tasks. In addition, there are no allegations that Supervisor Burnette ever used racial epithets or insults, or even referred to Plaintiff's (or anyone else's) race obliquely. Accordingly, to the extent any such claim was asserted, the Court recommends that Defendant's Motion to Dismiss be granted as to Plaintiff's racially hostile work environment claim.[5]

6. Common Law Wrongful Termination

Plaintiff's final claim is for wrongful termination under North Carolina common law. This claim is inextricably linked to Plaintiff's REDA and Title VII claims. Specifically, North Carolina courts have recognized that retaliating against an employee for exercising Workers' Compensation rights is against public policy and can simultaneously be the basis for both a common law wrongful termination claim and a REDA claim. Tarrant v. Freeway Foods of Greensboro, Inc., 163 N.C. App. 504, 509, 593 S.E.2d 808, 811 (2004); Brackett v. SGL Carbon Corp., 158 N.C. App. 252, 259-60, 580 S.E.2d 757, 762 (2003). Similarly, N.C. Gen. Stat. § 143-422.2 states that it is the public policy of North Carolina that employers should not discriminate against employees on the basis of,

---

of employment,' if that incident is 'extremely serious.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015). However, in the present case, Plaintiff has not made allegations of an incident that would rise to that level of seriousness.

[5] Of course, Plaintiff remains free to present information regarding his history with Supervisor Burnette as part of establishing the Title VII claims for disparate treatment and retaliation and the REDA claim going forward, and any further consideration of the substance of Plaintiff's contentions, and evidence supporting or disputing the contentions, can be considered on motions for summary judgment.

among other things, their race. Accordingly, because Plaintiff's REDA claim and his Title VII disparate treatment claim relating to his discharge survive the Motion to Dismiss, his common law wrongful termination claim does as well.

III. CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the Motion to Dismiss [Doc. #7] filed by Defendant NVT Technologies be GRANTED with respect to any Title VII hostile work environment claim, and DENIED with respect to all other claims.

This, the 6th day of July, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge